Clay A. WAGUESPACK, et al,

v.

Keith RODRIGUEZ.

No. Civ.A. 97–1965.

United States District Court,
W.D. Louisiana,
Lafayette/Opelousas Division.

Jan. 27, 1998.

---

## MEMORANDUM RULING

DOHERTY, District Judge.

This matter comes before the Court by way of appeal from a ruling issued by U.S. Bankruptcy Judge Gerald H. Schiff. The appeal was filed on behalf of Appellants Clay A. Waguespack and Louise Helen Waguespack ("Debtors") in this proceeding. Debtors assert the bankruptcy court erred when it denied confirmation of Debtors' proposed Chapter 13 plan that contained a charitable contribution as a budgeted expense of the Debtors, allowing Debtors to tithe 10% of their gross income to their church. For this reason, Debtors assert, enforcement of Fed-eral Bankruptcy Law 11 USCS 1325(B)(2)(A) creates an unreasonable imposition upon an individual's right to exercise and practice the religion of their choice. Appellants argue a Chapter 13 Trustee has no right to inhibit a debtor's free exercise of religion merely for purposes of collecting a larger dividend for unsecured creditors.

Conversely, while the bankruptcy court accepted these Debtors possess a sincerely held religious belief that they are required to tithe 10% of their gross income to their church, that their money belonged to God and not to themselves, and that they risked going to Hell if they failed to do so, the lower court, nevertheless, also determined under the totality of circumstances surrounding the Debtors' level of income, indebtedness and other expenditures contained in the Debtors' budget, all of which resulted in a plan that allegedly paid only 2% to the Debtors' general creditors, the Debtors' proposed level of tithing simply was not reasonable. This Court notes, and the bankruptcy court record evinces, that the Lower court did not ban charitable contributions or the practice of tithing as a general matter. Rather, it simply found unreasonable the Debtors' plan allowing monthly payments of $267.58 to their church and only $213.00 to their general creditors. Further, in a final and commendable effort to avoid any constitutional encroachment on free exercise, the bankruptcy court intimated it would be inclined to look favorably on an amended plan, even at the present level of tithing, if Debtors would agree to extend the plan to 60 rather than 36 months. However, the lower court was understandably resolute in its determination the interest of the Debtors in acting upon their religious beliefs must be balanced with the purpose of Chapter 13 of the Bankruptcy Code, maximizing payment to creditors.

### Background

Debtors filed a petition for relief under Chapter 13 of the Bankruptcy Code and filed a Chapter 13 plan, on May 12, 1997. The plan calls for the Debtors to pay $213.00 per month for 36 months. According to the plan, unsecured creditors would receive approximately 12.40% of their allowed claims. Keith A. Rodriguez, the standing Chapter 13 trust-

ee ("Trustee"), has objected to confirmation of the plan. This objection is based upon the inclusion of $267.58 per month for charitable contributions in the Debtors' Schedule I— Current Expenditures of Individual Debtors ("Schedule I"). The Trustee asserts the plan fails to satisfy the confirmation requirements of § 1325 B (1) in that it does not provide for either (i) 100% payments of claims (§ 1325(B)(1)(A)), or (ii) dedication to the plan of all of the Debtors' projected disposable income for at least three years (§ 1325(B)(1)(B)). Further, for purposes of this case "disposable income" is defined in § 1325(B)(2)(A) as "income which is received by the debtor and which is not reasonably necessary to be expended—(A) for the maintenance or support of the debtor or a dependent of the debtor ..." Simply stated, the Trustee's position, under the circumstances of this case, the $267.58 in charitable contributions is not an expense necessary for the maintenance and support of the Debtors or their dependents, and should be considered as disposable income within the meaning of § 1325(B)(2)(A).

In the bankruptcy court, Mr. Waguespack testified (a) the amount included in Schedule I as charitable contributions is the amount which he and his wife tithe each month, i.e. 10% of his gross income; (b) he has been tithing to his church for 23 years; (c) he believes money that he tithes does not belong to him, but belongs to God; and (d) he will go to Hell if he fails to tithe.

The lower court sustained Trustee's objection and denied confirmation of the plan, but allowed Debtor's to file an amended plan and/or budget consistent with its findings.

## Law and Analysis

This Court notes, while possessing no binding precedential value, but nevertheless insightful and persuasive, the majority of courts that have addressed the issue presented here have denied confirmation of Chapter 13 plans where debtors included tithes as a monthly living expense. *In re Reynolds,* 83 B.R. 684 (Bankr.W.D.Mo.1988); *In re Breckenridge,* 12 B.R. 159 (Bankr.S.D.Ohio, 1980); *In re Curry,* 77 B.R. 969 (Bankr.S.D.Fla. 1987); *In re Miles,* 96 B.R. 348 (Bankr. N.D.Fla.1989); *In re Cavanaugh,* 175 B.R.

369 (Bankr.D.Idaho 1994); *In re Packham,* 126 B.R. 603 (Bankr.D.Utah 1991); *In re Lees,* 192 B.R. 756 (Bankr.D.Mont.1994); *In re Tessier,* 190 B.R. 396 (Bankr.D.Mont. 1995).

The appropriate standard requires it to adopt the factual findings of the bankruptcy court unless "clearly erroneous." *U.S. v. United States Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). The Lower Court's conclusions of law are to be reviewed de novo. *World Hospitality Limited v. Wohl,* 983 F.2d 650 (5th Cir.1993).

Debtors have broadly asserted the issue confronting this Court is whether a Chapter 13 trustee may curtail or inhibit a debtor's right to exercise his religious freedom in order to collect a larger dividend for creditors. Relatedly, Appellants have made four specific assertions: (1) does *"God's"* "portion" form a part of the Debtors' Gross Income under Schedule I of their bankruptcy schedules; (2) does the Debtors' tithing expense constitute a reasonable and necessary expense for the "maintenance and support of the debtor and his family" as authorized in 11 USCS 1325(B)(2)(A); (3) is the denial of the Debtors' religious practice of tithing an unreasonable or unconstitutional infringement of these Debtors' right to freely practice their religion; and (4) is the Religious Freedom Restoration Act still viable after the U.S. Supreme Court case of *City of Boerne v. Flores,* —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), if a federal law or statute is alleged to substantially burden a person's exercise of religion.

This Court is convinced Debtors' are sincere about the religious beliefs they express. This Court is equally convinced Debtors are imbued with the conviction their constitutional right to free exercise of religion is being substantially burdened if Mr. Waguespack is not allowed to tithe the equivalent of 10% of his gross income, notwithstanding the fact they *voluntarily* filed a petition for relief under Chapter 13 of the Bankruptcy Code.

**I.** Appellants first request that this Court determine whether "God's portion", or the first 10%, forms a part of the Debtors' gross income under Schedule I of their bank-

ruptcy schedules. In support of an affirmative answer to this question, Appellants direct this Court's attention to the Judeo–Christian tradition generally, and the Bible specifically. Debtors liken their religious conviction regarding tithing to an assessment of taxes or social security that must be deducted before the Debtors' gross income is determined. While this Court has no doubt Christian tradition and the Bible afford moral authority, this Court is bound by constitutional and statutory authority which require it to effect a balancing between the adherent's right to free exercise of religion and the fundamental purpose of Chapter 13 of the Bankruptcy Code, maximizing payment to creditors.

II. Debtors next request this Court to determine whether a tithing expense constitutes a reasonable and necessary expense for the "maintenance and support of the Debtor and his family" as authorized in 11 USCS § 1325(B)(2)(A).

■ 11 USCS § 1325(B)(2)(A) of the Bankruptcy Code defines "disposable income" as "income which is received by the debtor and which is not reasonably necessary to be expended (a) for the maintenance or support of the debtor or a dependent of the debtor." Debtors assert this definition of disposable income requires this Court to delve into a given debtor's lifestyle which necessarily includes his religious beliefs. Debtors maintain that the proper query is whether the exercise of the debtor's religion is a part of the reasonably necessary lifestyle and practice of the debtor. Further, Appellants inquire whether tithing is more or less necessary than a second or third vehicle, private school for a debtor's children, recreational expenses, cable TV, etc.? In sum, Debtors assert that a lifestyle that includes the consistent practice of tithing should be treated no differently than a non-religious lifestyle or practice.

However well-intentioned Appellants' efforts may be, this Court finds that a determination of what "is reasonably necessary for maintenance or support of the debtor" a far simpler query than their argument would suggest. It is inescapable that the fundamental purpose of bankruptcy relief under Chapter 13 is to allow the debtor to maintain and sustain himself or herself while attempting to tunnel out from the avalanche of debt under which he or she has been buried. While tithing may be reasonably necessary for maintenance of the debtor's spiritual welfare, it is arguably neither indispensable to or necessary for the maintenance of his or her physical well-being. Further, Appellants cannot have their cake and eat it too: they cannot, in good faith, on the one hand voluntarily seek the financial safety and protection afforded by the bulwark of federal bankruptcy law and on the other, decry its religiously-neutral requirements.

This Court also declines Appellants' invitation to assess the centrality of their religious beliefs regarding tithing in order to be convinced it rises to the level of "... reasonably necessary ... for maintenance or support of the debtor ..." Such an inquiry would be both legally unavailing and beyond the institutional competence of this Court.

III. Debtors further request this Court to determine whether allowing debtors to tithe the full amount they desire constitutes an unreasonable or unconstitutional infringement of Debtors' religious free exercise. This Court finds this case is controlled by *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In *Smith*, the United States Supreme Court clearly held that a valid and neutral law of general applicability that only incidentally burdens religion does not offend the First Amendment's guarantee of free exercise.

We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate. On the contrary, the record of more than a century of our free exercise jurisprudence contradicts that proposition. As described succinctly by Justice Frankfurter in *Minersville School Dist. Bd. of Ed. v. Gobitis*, 310 U.S. 586, 594–595, 60 S.Ct. 1010, 1012–13, 84 L.Ed. 1375 (1940): "Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or

restriction of religious beliefs. The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities. (footnote omitted)"

We first had occasion to assert that principal in *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878), where we rejected the claim that criminal laws against polygamy could not be constitutionally applied to those whose religion commanded the practice. "Laws," we said, "are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.... Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself."

*Smith*, 494 U.S. at 878–79, 110 S.Ct. at 1600, 108 L.Ed.2d at 885–86.

In *Smith*, as in the case before this Court, the individuals claiming an infringement of their free exercise rights argued the statute in question must be evaluated under the analysis announced in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), which requires the government meet a "compelling interest" test in order to justify actions that "substantially burden" religious practices. Justice Scalia, writing for the majority, rejected this argument asserting the *Sherbert* test was unworkable in a "free exercise" context as applied to neutral laws, and called into question its applicability outside of the unemployment context in which it was created.

Although, as noted earlier, we have sometimes used the *Sherbert* test to analyze free exercise challenges to such laws, *see United States v. Lee*, supra[,] 455 U.S., at 257–260, 102 S.Ct., at 1055–57; *Gillette v. United States*, supra, 401 U.S., at 462, 91 S.Ct., at 842–43, we have never applied the test to invalidate one. We conclude today that the sounder approach, and the approach in accord with the vast majority of our precedents, is to hold the test in-

applicable to such challenges. The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, "cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development." *Lyng*, supra, 485 U.S., at 451, 108 S.Ct., at 1326. To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is "compelling"—permitting him, by virtue of his beliefs, "to become a law unto himself," *Reynolds v. United States*, 98 U.S., at 167—contradicts both constitutional tradition and common sense.

The "compelling government interest" requirement seems benign, because it is familiar from other fields. (citing as examples race and speech) ... [But it] is not remotely comparable to using it for the purpose asserted here. What it produces in those other fields—equality of treatment and an unrestricted flow of contending speech—are constitutional norms; what it would produce here—a private right to ignore generally applicable laws—is a constitutional anomaly.

494 U.S. at 884–86, 110 S.Ct. at 1603–04, 108 L.Ed.2d at 889–90.

The *Smith* court, beyond the analysis and rejection of the *Sherbert* test discussed above, highlighted one narrow and limited set of cases in which the First Amendment might conceivably present a bar to the application of a neutral law, namely where the free exercise claim is coupled with other constitutional protections, i.e., the so called "hybrid" claim. This Court finds the facts of this case do not give rise to any such claim. Appellants might argue that because the money they contribute to their church permits the church to expend resources to advance its message, the right of free speech as well as the right to free exercise is implicated. However, the suggestion of such a hybrid exception on the facts of this case would be strained, inventive, and without any constitutional limiting principle. It would be difficult to imagine any free exercise claim

that would not fit into the "hybrid" classification.

█ This Court cannot, on the facts presented, find that this section of federal bankruptcy law intends to target or regulate religious beliefs, a circumstance which would require the government to meet a compelling interest test to justify actions that substantially burden religious practices. As the *Smith* court stated later in its opinion:

> Precisely because 'we are a cosmopolitan nation made up of people of almost every conceivable religious preference,' *Braunfeld v. Brown*, 366 U.S., at 606, 81 S.Ct., at 1147, and precisely because we value and protect that religious divergence, we cannot afford the luxury of deeming *presumptively invalid*, as applied to the religious objector, every regulation of conduct that does not protect an interest of the highest order. The rule respondents favor would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind.... The First Amendment's protection of religious liberty does not require this.

494 U.S. at 888–89, 110 S.Ct. at 1605–06, 108 L.Ed.2d at 892.

This Court finds the relevant portion of the federal bankruptcy statute to be a valid and neutral law of general applicability that only incidentally burdens religion and, therefore, does not unconstitutionally violate Debtors' right to free exercise of religion.

## IV. The Religious Freedom Restoration Act of 1993

This Court notes the Religious Freedom Restoration Act (R.F.R.A.) was declared unconstitutional in its totality and for all purposes by the U.S. Supreme Court in *City of Boerne v. Flores*, —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) and has no bearing on this case. This Court further notes, for historical purposes, R.F.R.A. was passed in response to the *Smith* decision discussed above for the stated purpose of restoring the compelling interest test as set forth in *Sherbert, supra,* and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). *Flores* was the first case to reach the U.S. Supreme Court following the adoption of R.F.R.A. It dealt with a local zoning ordinance that had an incidental effect on proposed renovations to a church building located in Texas. Further, while the *Flores* Court addressed other areas of constitutional law, including Congress' enforcement powers under § 5 of the Fourteenth Amendment, relevant to the matter before this Court is what the Supreme Court deemed to be a Congressional attempt to substantively change the content of the free exercise clause of the First Amendment:

> ... Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause. Congress does not enforce a constitutional right by changing what the right is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation ...

*Flores,* —— U.S. at ——, 117 S.Ct. at 2164, 138 L.Ed.2d at 638.

The *Flores* Court went on to reiterate, reminiscent of the *Smith* opinion, the unworkable nature of a heightened compelling interest standard when applied to neutral laws of general applicability:

> R.F.R.A.'s substantial burden test, however, is not even a discriminatory effects or disparate impact test. It is a reality of the modern regulatory state that numerous state laws, such as the zoning regulations at issue here, impose a substantial burden on a large class of individuals. When the exercise of religion has been burdened in an incidental way by a law of general application, it does not follow that the persons affected have been burdened any more than other citizens, let alone burdened because of their religious beliefs. In addition, the Act imposes in every case a least restrictive means requirement—a requirement that was not used in the pre-*Smith* jurisprudence R.F.R.A. purported to codify—which also indicates that the legislation is broader than is appropriate if the goal is to prevent and remedy constitutional violations.

—— U.S. at ——, 117 S.Ct. at 2171, 138 L.Ed.2d at 648.

Further, while the *Flores* Court's Fourteenth Amendment analysis played a prominent role in that opinion, the Court was clear it was also invalidating R.F.R.A. because it violated the principle of separation of powers between Congress and the Judiciary. In doing so, the Court invoked the seminal, well-settled and unassailable principle established in *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 177, 2 L.Ed. 60 (1803):

> Our national experience teaches that the Constitution is preserved best when each part of the government respects both the Constitution and the proper actions and determinations of the other branches. When the Court has interpreted the Constitution, it has acted within the province of the Judicial Branch, which embraces the duty to say what the law is. *Marbury v. Madison*, 1 Cranch, at 177, 2 L.Ed. 60. When the political branches of the Government act against the background of a judicial interpretation of the Constitution already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles, including *stare decisis*, and contrary expectations must be disappointed. R.F.R.A. was designed to control cases and controversies, such as the one before us; but as the provisions of the federal statute here invoked are beyond congressional authority, it is this Court's precedent, not R.F.R.A., which must control.

*Flores*, —— U.S. at ——, 117 S.Ct. at 2172, 138 L.Ed.2d at 649.

Because R.F.R.A. has been declared unconstitutional, that statute and the compelling interest standard which it embodies have no application in this case. This Court can appreciate Appellants might have a more compelling argument had the lower court flatly and strictly banned tithing or church-related expenses from a budget and plan under Chapter 13. However, that was clearly not the intent or reasoning behind its decision. Rather, the bankruptcy court treated the tithing expense as it would any other expense contained in the Debtors' budget. That court specifically stated that while it was not prohibiting the Debtors from tith-

ing, it found the level of tithing unreasonable given all the other facts and circumstances of the case. The lower court made clear its intention to allow these Debtors to include reasonable charitable contributions as an expense. That court simply did not believe the sum of $267.58 per month represented a reasonable charitable contribution.

Considering the foregoing Memorandum Ruling and the reasons assigned by the bankruptcy judge, this Court AFFIRMS the decision of the bankruptcy court in this matter.

### ORDER

Considering the foregoing Memorandum Ruling;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that this Court AFFIRMS the decision of the bankruptcy court in this matter.