Lawrence CALDWELL, Plaintiff,

v.

Willie CAESAR, et al., Defendants.

No. CIV.A. 98–1857(GK).

United States District Court,
District of Columbia.

May 22, 2001.

Lawrence D. Caldwell, Lorton, VA, Pro se.

Brigitte L. Adams, Washington, DC, for Plaintiff.

Michael Alan Stern, Charlotte Anne Bradley, Andrew Stewart Hoenig, Office of Corporation Counsel D.C., Washington, DC, Robert Patrick Scanlon, Anderson & Quinn, Rockville, MD, for Defendants.

### MEMORANDUM OPINION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

KESSLER, District Judge.

Plaintiff, a District of Columbia prisoner, has sued Aramark Correctional Services, Inc. ("Aramark"), two of its employees,[1] the District of Columbia, and Willie Caesar, who was the Chaplain at Lorton Reformatory's Maximum Security Facility ("Maximum"), for damages suffered as a result of alleged actions in violation of the Civil Rights Act, 42 U.S.C. § 1983, and District of Columbia law. The four claims in the complaint relate to Aramark's operation of the food service at Maximum under contract with the District of Columbia. The first claim alleges that all Defendants violated his First Amendment rights by restricting his access to a vegetarian diet which he asserts is based on religious principles. (Complaint, Count I). The District of Columbia and Caesar alone are named in a count charging violation of the Fifth Amendment because of racial bias in their responses to Plaintiff's requests for renewal of his religious diet. (Complaint, Count II). Finally, Plaintiff asserts that the food service at Maximum provided inadequate nutrition and was handled under conditions so unsanitary as to violate the

---

1. These are Angela Proctor, who was Aramark's Food Service Director at Maximum, and Muriel Raglan, Aramark's resident dietician.

Eighth Amendment (Complaint, Count III) and to constitute negligence under District of Columbia law (Complaint, Count IV).

Discovery has been completed and the Defendants have filed motions for summary judgment. After consideration of the pleadings, the applicable case law, and the entire record herein, the motion of Defendant Caesar for summary judgment on the third and fourth counts of the complaint will be granted. In all other respects, the motions will be denied.[2]

### I. The Standard of Review

A motion for summary judgment should be granted if the moving party demonstrates that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering whether there is a triable issue of fact, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248, 106 S.Ct. 2505. Moreover, "any factual assertions in the movant's affidavits will be accepted as being true unless [the opposing party] submits his own affidavits or other documentary evidence contradicting the assertion." *Neal v. Kelly,* 963 F.2d 453, 456 (D.C.Cir.1992)(quoting *Lewis v. Faulkner,* 689 F.2d 100, 102 (7th Cir. 1982)); *Washington Post Co. v. United States Dep't of Health and Human Servs.,* 865 F.2d 320, 325 (D.C.Cir.1989).

### II. Statement of Facts

Plaintiff, who is 54 years old, joined the Liberal Catholic Church in 1978. He had adopted a vegetarian diet for health reasons when he was 16 years old and maintains that diet now for religious reasons, because he believes it is ecologically sound, and because he believes that meat production is cruel to animals. Caldwell Dep. pp. 7, 27–28, 33–34, 38–41, 43–44. According to Father William Delahunt, an ordained priest of the Liberal Catholic Church, the Church is not dogmatic and does not require any doctrinal beliefs of its members. The Church does, however, "exhort and counsel and encourage people to follow certain patterns and habits and lifestyles that are spiritually encouraging and uplifting." Delahunt Dep. pp. 15–16; Caldwell Dep. pp. 25–26, 37–38, 43–44. Among those lifestyles that the church encourages but does not require is a vegetarian diet. Delahunt Dep. p. 16; Caldwell Dep. pp. 25–26, 37, 42.

Plaintiff was incarcerated at the Maximum Security Facility at Lorton from May 1997, until it closed in January 2001. Caldwell Dep. p. 12. Aramark provided food service at Maximum pursuant to a contract with the District of Columbia Department of Corrections. Affidavit of Robert Rago, Aramark's Resident District Manager, Aramark Motion Ex. 1, ¶ 1. The contract required Aramark to provide a lacto-ovo-vegetarian diet to prisoners who were authorized by the Chaplain to receive a religious diet; Aramark itself had no authority under the contract to authorize a prisoner to receive a "religious" diet. Rago Affid. ¶¶ 4, 5, 8, 9. When the Chaplain authorized the diet, he submitted a form to Aramark, whose personnel entered the prisoner's name into Aramark's com-

---

**2.** The District of Columbia and Caesar filed a Cross–Claim against Aramark, which Aramark has answered. No motion has been filed affecting the Cross–Claim.

puterized accounting system to receive the lacto-ovo-vegetarian diet. The prisoner then was authorized to receive the religious diet for 90 days. At the end of that period, unless the authorization was renewed, the prisoner's name was automatically deleted from the Aramark computer list of those authorized to receive the religious diet. Rago Affid. ¶ 7.

Although many inmates came to the dining hall for meals, Plaintiff and others who were in segregation received trays in their cells. Caldwell Dep. pp. 47. After Aramark prepared the food for those prisoners, its employees placed the meals on trays that were loaded onto carts. Rago Affid. ¶ 10. Inmates and employees of the District of Columbia Department of Corrections then were responsible for delivering the food on the carts to the various cell blocks. Rago Affid. ¶ 10. Guards at the cell blocks sorted the trays for distribution to the tiers and to individual cells. Rago Affid. ¶ 10. Aramark had no control over whether a prisoner actually received a religious diet. Rago Affid. ¶ 11. If notified that a special tray had been mis-delivered, Aramark would provide a replacement meal. Rago Affid. ¶ 12.

### III. Discussion

#### A. The First Amendment Claim: Free Exercise of Religion

##### 1. The Arguments of the Aramark Defendants.

■ These Defendants do not dispute that, as an inmate, Plaintiff retains the right under the First Amendment to free exercise of his religion.[3] Rather, they argue that Plaintiff has not shown that they have violated this right. First, they contend that the restraints placed on his ability to receive the vegetarian diet were imposed not by Aramark, but by the District of Columbia, in an appropriate effort to control costs. Next, they suggest that Plaintiff has failed to show that adherence to a vegetarian diet is an essential practice of his religion. Finally, they argue that in any event the renewal requirement was permissible because it did not unreasonably restrict Plaintiff's ability to practice his religion.[4]

Opposing the motion for summary judgment, Plaintiff argues that his desire to restrict his diet is a legitimate and sincerely held religious belief. He claims that his right to free exercise of his religion was burdened impermissibly in three ways: (1) by the requirement that he request renewal of his religious diet at 90 day intervals; (2) by the termination of his religious diet at less than 90 day intervals; and (3) by Aramark's failure to provide him consistently with a strictly vegetarian diet even during periods when the diet had been authorized.

Plaintiff principally relies on the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, which provides that a government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general ap-

---

**3.** "Prisoners retain constitutional rights, including the right to freedom of religion." *La-Fevers v. Saffle,* 936 F.2d 1117, 1118–19 (10th Cir.1991), *citing Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) and *Cruz v. Beto,* 405 U.S. 319, 322–23, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). *See also Sewell v. Pegelow,* 291 F.2d 196, 198 (4th Cir.1961) ("[i]t has never been held that upon entering a prison one is entirely bereft of all

his civil rights and forfeits every protection of the law").

**4.** For purposes of the motion, the Aramark Defendants assume that they were acting "under color of state law" within the meaning of the Civil Rights Act, 42 U.S.C. § 1983. Memorandum in Support of Motion for Summary Judgment, p. 6 n. 4.

plicability" unless the burden "is the least restrictive means of furthering [a] compelling governmental interest." Plaintiff argues that Defendants have not shown a "compelling governmental interest" for what he claims was a substantial burden on his religious practices.

Aramark argues that the RFRA is unconstitutional and that the governing standards for prison regulations regarding religious observances are those established in *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) and *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Under *O'Lone* and *Turner,* a prisoner's right to free exercise of his religion can be curtailed to some extent when the restriction is reasonably related to a legitimate penological interest.

The RFRA was enacted by Congress in 1993 specifically to overturn the decision in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990),[5] and to reinstate previous judicial interpretations of the First Amendment. In *Smith,* the Supreme Court held that the First Amendment allows governments to apply neutral, generally applicable laws to religious practices without a showing of a compelling governmental interest. In *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Court held that the RFRA was unconstitutional as applied to the states and rejected the argument that the Act was a proper exercise of the power given to Congress in Section 5 of the Fourteenth Amendment "to enforce, by appropriate legislation, the provisions of" that amendment.

The primary discussion in *City of Boerne* was whether the RFRA was a proper exercise of the power given to Congress to regulate state conduct under the Fourteenth Amendment. There has been no Supreme Court decision as to whether the RFRA is a constitutional application of the Congressional power to regulate conduct of the federal government and the District of Columbia. As amended after the decision in *City of Boerne,* the RFRA now specifically includes the District of Columbia as a "covered entity." 42 U.S.C. § 2000bb2(2).

In two cases, the Court of Appeals for this Circuit has assumed without discussion that the statute remains viable as to the federal government. *Branch Ministries v. Rossotti,* 211 F.3d 137 (D.C.Cir. 2000); *Alamo v. Clay,* 137 F.3d 1366, 1368 (D.C.Cir.1998).[6] There appears to be no decision of either the Court of Appeals for this Circuit or this District Court that has dealt with the question on the merits. Compare *Jackson v. District of Columbia,* 89 F.Supp.2d 48 (D.D.C.2000);[7] *and Henderson v. Stanton,* 76 F.Supp.2d 10, 14 n. 1 (D.D.C.1999)(assuming the RFRA constitutional as applied to federal actions) *with Branch Ministries v. Rossotti,* 40

---

**5.** The preamble to the RFRA reciting Congressional findings and declaration of purposes states flatly that in *Smith* "the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion," 42 U.S.C. § 2000bb(a)(4). It continues that "[t]he purposes of this chapter are—(1) to restore the compelling interest test ... and to guarantee its application in all cases where free exercise of religion is substantially burdened...." 42 U.S.C. § 2000bb(b).

**6.** In *Alamo* the Court noted "we assume, without deciding, that the RFRA applies to the federal government, notwithstanding the Supreme Court's decision in *City of Boerne.*"

**7.** In *Jackson,* Judge Kennedy noted that there was doubt as to "[w]hether the RFRA survives *City of Boerne* " but assumed its constitutionality for purposes of that case.

F.Supp.2d 15, 24 n. 6 (D.D.C.1999)(noting that the federal defendant did not challenge the constitutionality of the RFRA as to it) *and Branch Ministries, Inc. v. Richardson,* 970 F.Supp. 11, 13 n. 1 (D.D.C.1997)(simply noting the decision in *City of Boerne* ).[8]

Decisions in other circuits are divided. *Compare, e.g., Waguespack v. Rodriguez,* 220 B.R. 31 (W.D.La.1998) *and United States v. Sandia,* 6 F.Supp.2d 1278 (D.N.M.1997), *aff'd,* 188 F.3d 1215 (10th Cir.1999) (emphasizing supremacy of the Supreme Court in defining constitutional rights and holding the RFRA unconstitutional) *with, e.g., Christians v. Crystal Evangelical Free Church,* 141 F.3d 854 (8th Cir.), *cert. denied,* 525 U.S. 811, 119 S.Ct. 43, 142 L.Ed.2d 34 (1998)(holding, 2–1, the RFRA within the power of Congress to provide additional protections for religious entities in bankruptcy proceeding) *and United States v. Ramon,* 86 F.Supp.2d 665 (W.D.Tex.2000) (assuming the RFRA still applicable to federal government).

Given the context of this motion for summary judgment and its ultimate resolution, the Court will assume that the RFRA is constitutional as applied to actions of the District of Columbia.

■ After arguing that the RFRA standards should not apply, the Aramark Defendants point to earlier case law establishing that a prisoner's First Amendment right to free exercise of his religion may be circumscribed to some extent when the restriction is reasonably related to a legitimate penological interest. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107

S.Ct. 2400, 96 L.Ed.2d 282 (1987). In *Turner v. Safley,* 482 U.S. 78, 89–90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Court identified four factors that determine the reasonableness of restrictions placed upon a prisoner's exercise of his constitutional rights:

1. whether the regulation or action has a logical relation to legitimate government interests invoked to justify it;

2. whether the inmate has an alternative means of exercising the right;

3. the impact that accommodation of the asserted constitutional rights would have on other inmates, guards, and prison resources; and

4. the presence or absence of ready alternatives that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

The Aramark Defendants argue that the requirement that Plaintiff renew his special diet request every 90 days was justified by a legitimate penological interest and therefore was reasonable under the standards of *O'Lone* and *Turner.*

Based on the totally inadequate record presented in support of the motions, the Court concludes that Defendants have not shown that they are entitled to summary judgment, as a matter of law, on the first count of the complaint, whether the RFRA standards or the *O'Lone Turner* standards are applied. There are numerous material facts in dispute such as the terms of the contract between Aramark and the District of Columbia, the respective obligations of the parties under that contract,[9]

---

**8.** In *Alamo, Branch Ministries,* and *Henderson,* the federal defendants did not oppose the plaintiffs' argument that the RFRA was constitutional as applied to the federal government.

**9.** For example, there is a conflict as to who bore responsibility for setting the period for

which a religious diet approval would be effective. Rago states that the contract provided for a ninety-day period. Rago Affid. ¶ 5. In answers to Plaintiff's interrogatories, however, Aramark stated that the Chaplain fixed the duration of the approval, which could be be-

the genuineness of Plaintiff's religious beliefs, and the centrality of vegetarianism to his religion and to his own religious beliefs. These clearly disputed issues are material and cannot be resolved on a motion for summary judgment; they must be resolved by a jury.

The only uncontested aspect of the contract between the District of Columbia and Aramark is that the chaplain was required periodically to review and approve each request for a religious diet. Rago Affid., ¶¶ 4–7. Inexplicably, no party has provided a copy of the contract itself. Robert Rago, Aramark's Resident District Manager, states that the renewal requirement was placed in the contract at the insistence of the District of Columbia, which wanted to limit the additional expense involved in preparing special meals for inmates with religious (or medical) dietary restrictions. Rago Affid., Aramark Motion, Ex. 1, ¶ 5.[10] Rago asserts that "[i]t is common" for inmates on the religious diet to choose to go through the regular line instead of taking their special diet if they prefer the offerings on the regular line (specifically baked chicken), resulting in waste of the more expensive special vegetarian meals. Rago Affidavit ¶ 6.[11] According to Rago, it was "[p]ursuant to this policy" that "an inmate must file a renewed request for a special diet every ninety days." *Id.* ¶¶ 5, 6.

This justification for requiring renewal of a religious diet request clearly cannot apply to Plaintiff since he was in segregation. Because he was served his meals in his cell, Plaintiff could not choose to go through the regular diet line. Thus, Plaintiff argues persuasively, no correctional goal warranted a requirement that he renew his diet request at 90 day intervals. Assuming that Plaintiff's religious convictions are sincere, there was no reason to expect that his beliefs would change within 90 days or to require him to reaffirm his convictions periodically. The Defendants have not adequately demonstrated that the renewal requirement itself serves even a legitimate penological purpose, at least as to persons such as Plaintiff who are confined to their cells, no less a compelling governmental interest.

The Aramark Defendants next contend that Plaintiff's adherence to a vegetarian diet is not a basic tenet of his religion, *see Wisconsin v. Yoder*, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and, therefore, the requirement for periodic renewal of authorization for the diet is reasonable. Plaintiff's own testimony and

tween 30 and 90 days. Answer to Interrogatory A.6, Plaintiff's Exhibit L.

The District of Columbia Defendants, on the other hand, attribute to Aramark the responsibility for setting the renewal period at 90 days. Rev. Caesar states that he "do[es] not control when requests for special diets are made, *or the duration of the approval of those requests.*" Plaintiff's Exhibit B, p. 2 (emphasis added.). See also the District of Columbia Defendants' Motion for Summary Judgment, Statement of Uncontested Material Facts # 6.

10. On the other hand, in its answer to the District of Columbia's Cross–Claim, Aramark admitted the allegation that it had "developed procedures and policies designed to comply with ... contract requirements" including "a requirement, *propounded by Aramark Correctional Services, Inc.* that all special requests for religious diets be renewed every 90 days." Cross–Claim, First Paragraph 9 (emphasis added); Answer to Cross–Claim, ¶ 7. If the *renewal requirement was propounded by Aramark* for business reasons, it would not be based on any governmental or penological interest, much less a "compelling" one.

11. Defendants have presented no statistics on the number of vegetarian meals that were rejected in favor of the regular meal offering or of the respective costs of vegetarian and regular meals. Indeed, it does not appear that the renewal requirement alone prevents an inmate from choosing the regular meal one day and the vegetarian meal the next.

that of his expert witness, Father William Delahunt, were that adherence to a vegetarian diet is strongly encouraged by the Liberal Catholic Church. There is, therefore, a genuine issue as to the nature of Plaintiff's religious beliefs and the extent to which adherence to a vegetarian diet is essential to his religion. Such a disputed issue can only be resolved by a jury.

Plaintiff has presented substantial evidence that he was required to renew his religious diet at arbitrary and inconsistent intervals. *See, e.g.,* Caldwell Dep. pp 69–78, 109–14; Plaintiff's Opposition to Defendants' Motion, Exhibits O, P, Q, R. The Court concludes that there is a genuine issue of fact as to whether the requirement that prisoners such as Plaintiff renew their requests for a religious diet every 90 days, or at arbitrarily designated intervals, was a substantial burden on Plaintiff's exercise of his religious beliefs and whether that requirement was the least restrictive means of satisfying either a compelling governmental interest or a legitimate penological interest. Moreover, the record does not show whether Plaintiff has any alternative means of observing his own religion while he is in prison. For this reason, the burden of requiring Plaintiff to reaffirm his religious beliefs periodically would exceed the burden on other inmates who, for example, are able to engage regularly in group prayer with ministers of their own faith. *See Turner,* 482 U.S. at

89–90, 107 S.Ct. 2254. The Aramark Defendants' motion for summary judgment on the first claim will, therefore, be denied because numerous material issues of fact are in dispute.[12]

## 2. The Argument of the District of Columbia and Rev. Caesar [13]

These Defendants do not discuss at length whether Plaintiff's First Amendment rights have been violated by the procedures governing his request for a religious diet and the implementation of that request. They simply suggest that the Court need not consider "whether the Liberal Catholic Church is a recognized religion" or whether Plaintiff's religious beliefs "are sincere." Without argument and without reference to any portion of the record, they state that Plaintiff has not provided facts to support his claim that Defendants have acted purposely to interfere with his exercise of his religious beliefs. The motion will be denied for the reasons stated in connection with the motion of the Aramark Defendants.

## B. The Fifth Amendment Claim: Discrimination Based on Race

■ In the second count of the complaint, Plaintiff charges the District of Columbia and Rev. Caesar with racial discrimination in violation of the Fifth Amendment. Plaintiff may prevail if he can demonstrate that the Defendants

---

12. The Aramark Defendants also argue that they are not responsible for the times when Plaintiff did not receive the vegetarian diet either because the chaplain had not renewed the authorization or because an authorized vegetarian tray was not delivered by District of Columbia personnel or inmates. If the Aramark Defendants are found to have wrongly interfered with Plaintiff's First Amendment rights in connection with the renewal requirement, this argument would affect the measure of damages rather than liability.

13. The motion filed by these Defendants is woefully inadequate. The legal arguments are entirely conclusory. There are no references to any portions of the record that supposedly support those legal arguments. Moreover, Defendants have failed to respond to Plaintiff's substantive opposition to their motion, which is supported by extensive legal discussion and record references. Defendants simply ignore much of the relevant case law.

treated him differently from others in similar circumstances without any rational relationship to a legitimate penological purpose and because of purposeful or intentional racial discrimination. *See Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944); *Brandon v. DC Board of Parole,* 823 F.2d 644, 650 (D.C.Cir.1987); *Marshall v. Reno,* 915 F.Supp. 426, 432 (D.D.C.1996). Racial discrimination in the administration of religious diet requests plainly would violate clearly established constitutional law, as any reasonable correctional officer or prison psychologist knew or should have known. *See Anyanwutaku v. Moore,* 151 F.3d 1053, 1058 (D.C.Cir.1998); *cf. Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

■ Defendants argue that Plaintiff has failed to prove that the delay in approving his religious diet requests was based on his race. They suggest that the only evidence adduced is Plaintiff's own testimony that he observed that two African–American inmates who were housed near him were not required to renew their diet requests as frequently as he was.

Plaintiff has testified that he is Caucasian;[14] Defendants admit that Defendant Caesar is African–American.[15] Defendants have not contradicted Plaintiff's testimony that on many occasions he was required to request renewal of his religious diet at considerably shorter intervals than the 90 days that the contract allegedly specified. Caldwell Dep. pp. 69–78, 109–14. Plaintiff's testimony is supported by copies of numerous renewal requests he made during 1998 and 1999 when his vegetarian diet had been suspended at less than 90 day intervals. *See* Exhibits O, P, Q, and R to the opposition to the District of Columbia's motion. Plaintiff testified that the only evidence he has for his contention that he was treated differently from African–American inmates was his observation of the experience of the other two inmates. Caldwell Dep. pp. 45–46, 52.[16] Based on these observations, Plaintiff contends that his diet was discontinued "more often than with African–American prisoners." Caldwell Dep. p. 131.

Defendant Caesar states in a declaration that he treated all inmates the same. He asserts that he would approve a religious diet for any inmate who requested one and that he is "pretty sure that I approved the religious diet for Lawrence [Caldwell] before I became aware that he had filed a lawsuit about it." He suggests that perhaps Plaintiff "never sent the requests" for a religious diet, or that the requests had been lost somehow in the prison mail, or that he had been so busy that he could not act on the request "immediately." Motion of District of Columbia and Caesar, Caesar Decl., unpaginated, pp. 2–4.[17] These statements are reasonably consistent with those Defendant Caesar made in an affidavit prepared in connection with an earlier motion to dismiss filed by these Defendants. In that affidavit Defendant Caesar claimed that he did not know Plaintiff at the time

---

14. Caldwell Dep. pp. 46, 93.

15. Answer and A Cross–Claim, ¶ 3.

16. Plaintiff added that although he did not "know how much emphasis to base on this," he testified that "a couple of inmates have said that Reverend Caesar doesn't like white boys." Caldwell Dep. p. 129.

17. Chaplain Caesar asserts that he sometimes "got behind" on his approvals because of other responsibilities, that sometimes he did not receive communications sent through the prison mail, that he relied on the inmates to send him renewal requests on about the 70th day of the approval period, and that he either took the approval to Aramark or, to expedite it, called it in. Caesar Decl., unpaginated, pp. 3, 4.

he reviewed the requests, and that he had not associated the person he had spoken to in the prison yard with the requests that were in his office waiting for approval. Moreover, he asserted in this first affidavit, he did not know that the Caldwell who had.requested the religious diet was Caucasian until he received a copy of the complaint, which was filed in July 1998. Plaintiff's Opposition to Motion for Summary Judgment, Exhibit B.

To contradict these declarations, Plaintiff relies on notes he sent to Defendant Caesar several months before the complaint was filed, expressing his belief that he was being discriminated against because of his race. One note, sent on March 8, 1998, complained that Plaintiff had been obliged to renew his diet at one or two month intervals, and that because "[o]thers have not been subjected to this harassment ... I must presume it is because I am Caucasian, Christian, and litigious." On April 29, 1998, Plaintiff sent Caesar a similar note stating that he was being subjected to different treatment from that accorded African–American prisoners. Plaintiff had been advised that his religious diet, which had been renewed a month earlier on March 21, had to be renewed again. Plaintiff asserted in the note that African–American prisoners either were not required to renew their religious diet requests at all or only at 90 day intervals. Six days later in a third note to Rev. Caesar, Plaintiff asked that he not be subjected to disparate treatment. Plaintiff's Opposition, Exhibit P.

Defendants have not presented any evidence, other than Rev. Caesar's rather self-serving denial, to contradict Plaintiff's testimony that he was required to renew his diet requests more often than the designated 90 days and at more frequent intervals than African–American prisoners. Plaintiff's testimony and the contemporary notes that he wrote to Rev. Caesar provide sufficient direct and circumstantial evidence, albeit perhaps not the strongest, from which a reasonable jury could find that he was accorded disparate treatment because of his race.

Rev. Caesar's primary defense to this claim is that he is entitled to qualified immunity. A local official faced with a claim of violation of constitutional rights under 42 U.S.C. § 1983 may be entitled to qualified immunity if the conduct alleged "does not violate ... clearly established ... constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In determining whether a particular official is entitled to the immunity from suit accorded by qualified immunity, the Court must determine whether the defendant's conduct was objectively reasonable under "clearly established" law. *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727.

Although Plaintiff's claim is based on alleged discrimination on the grounds of race, Defendant Caesar does not claim he would be entitled to immunity if he is found to have discriminated against Plaintiff because of his race. Any such claim would be frivolous. In the memorandum in support of the motion, Defendant attacks the genuineness of the Liberal Catholic Church and appears to suggest that because Rev. Caesar had not heard of the Liberal Catholic Church, he was justified in delaying approval of Plaintiff's diet requests.[18] In any event, Defendant miscon-

18. The memorandum in support of the motion cites Caesar's affidavit as stating that "the Roman Catholic Church does not recognize the Liberal Catholic Church." No such statement appears in the affidavit submitted with the motion. Nor is there authority in the record for the statement in the memorandum that "Rev. Caesar was told by a Roman Cath-

ceives the nature of the qualified immunity defense. It is the *constitutional right* to nondiscriminatory treatment under the Fifth Amendment that must be "clearly established," not the validity of the particular individual's underlying substantive claim which, in this case, is his claim to exercise his First Amendment right to freedom of religion.

██ To reiterate, Rev. Caesar does not and cannot claim that he was unaware that it would violate Plaintiff's constitutional rights if he were treated differently because of his race. As noted, there is sufficient evidence, direct and circumstantial, for a jury reasonably to conclude that Plaintiff was treated differently from African–American prisoners and that Rev. Caesar, despite his denials, was aware that Plaintiff is Caucasian. Qualified immunity does not provide Rev. Caesar a defense to this action. Defendants' motion for summary judgment on the second count of the complaint will be denied.

### C. The Eighth Amendment Claim: Unsanitary Food and Inadequate Nutrition

██ Although "[t]he Constitution 'does not mandate comfortable prisons,' ... neither does it permit inhumane ones...." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)(quoting *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). "[I]t is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Farmer*, 511 U.S. at 832, 114 S.Ct. 1970 (quoting *Helling v. McKinney*, 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). Conditions of confinement will violate the Eighth Amendment if the deprivation is sufficiently serious, judged objectively, that is, when the prisoner is denied "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970 (quoting *Rhodes*, 452 U.S. at 347, 101 S.Ct. 2392). Moreover, the prison official(s) must have acted with deliberate indifference to the health or safety of the inmate, that is, with recklessness. *Farmer*, 511 U.S. at 834–35, 114 S.Ct. 1970; *Wilson v. Seiter*, 501 U.S. 294, 303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). In order to find an Eighth Amendment violation respecting conditions of confinement, the evidence must show that the prison official was "both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

Plaintiff contends that the Eighth Amendment was violated because the food served had been prepared and served in

olic priest that there was no such thing as the Liberal Catholic Church." In any event, whether or not one religious sect recognizes the "validity" of another sect is irrelevant to the question whether adherents to that religion possess rights under the First Amendment. *See Sequoyah v. TVA*, 620 F.2d 1159, 1163 (6th Cir.), *cert. denied*, 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 216 (1980):

"There is no requirement that a religion meet any organizational or doctrinal test in order to qualify for First Amendment protection. Orthodoxy is not an issue. The fact that Cherokees have no written creeds and no man-made houses of worship is of no importance. The Cherokees have a religion within the meaning of the Constitution and the sincerity of the adherence of individual plaintiffs to that religion is not questioned."

In fact, the unchallenged evidence in this case shows that the Liberal Catholic Church is a well recognized church, founded in England in 1916. Additional information about the Church, including its branches throughout the United States, Europe, Asia, Africa, and South America, may be found easily on the Web at *www.liberalcatholic.org*.

unsanitary conditions that presented a serious risk of physical harm. He also argues that the meals themselves provided inadequate nutrition.

### 1. Sanitary Aspects of Food Preparation and Service

■ In their motion for summary judgment, the Aramark Defendants point out that Plaintiff has not provided any evidence that he was actually exposed to any contaminated food or that he suffered any ailment that would have resulted from contamination. They argue, therefore, that he has failed to produce evidence of the injury that is a necessary element of an Eighth Amendment claim. They rely on *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) and *Scott v. District of Columbia,* 139 F.3d 940 (D.C.Cir.1998). The District of Columbia Defendants contend that the food handling areas at Maximum were sanitary, citing only the testimony of Plaintiff's expert witness, Robert Powitz, that the kitchen is "relatively well maintained and . . . sanitary." Powitz Dep. p. 36.[19]

In opposing the motions, Plaintiff relies primarily on the report and deposition testimony of Robert Powitz, an expert in public and environmental health, who examined the food service facilities, maintenance and housekeeping at Lorton as an expert witness on behalf of the District of Columbia in 1997,[20] and again in December 1999, this time on behalf of Plaintiff. Powitz was of the opinion that conditions had "continued to erode" since he had observed the food handling practices in 1997. Plaintiff's Opposition, Attachment F. In his deposition as well as in his written report, Powitz describes various food handling practices that were "unsanitary and unsafe," "conducive to ill health and discomfort and . . . below all reasonable accepted standards of human habitability." Plaintiff's Opposition, Exhibit F, p. 1.[21]

When Powitz toured the kitchen at Maximum in December 1999, he observed instances of moldy bread being served, food kept at improper temperatures, unclean cooking equipment, Powitz Dep. pp 10–11, 16–17, water from pipes dripping on food, *id.,* pp. 17–18, the aroma of cat urine in the food storage areas, *id.,* p. 8, an inconsistent food dating system, *id.,* p. 7, and mingling of personal clothing with kitchen utensils, *id.,* pp. 14–15. He testified that refrigerator doors and one thermometer were broken, although the refrigerators were at appropriate temperatures. *Id.,* pp. 13–15, 52. He found several instances in which dried food remained on food service equipment. Powitz was particularly critical of the apparent failure of service personnel to wash their hands, which he

---

19. Curiously, the District of Columbia Defendants do not mention *Scott,* a recent decision of the Court of Appeals for this Circuit that is arguably relevant.

20. Powitz testified that following his 1997 evaluation he produced a report that would be in the office of the Director of the Department of Corrections. The record does not disclose the circumstances of his 1997 visit.

21. Powitz testified that he had been prevented by counsel for the District of Columbia from asking about "an important component of kitchen sanitation", that is, the Hazard Analysis Critical Control Point ("HACCP"). Powitz

Dep. pp. 5–6. He testified that kitchens generally keep logs of how long food is maintained at critical temperatures that promote the growth of pathogens, and how quickly food is returned to safe temperatures. The Corporation Counsel, however, told him he could not inspect logs or ask about HACCP. Powitz Dep. pp. 5–6. Nor was he allowed to ask whether leftover meat generally was retained for service at future meals, despite standard practice "that potentially hazardous food should not be reserved, particularly in an institutional setting." Powitz Dep. pp. 9, 48–50.

testified was a clear violation of standards of cleanliness for food service entities. He did not observe any hand washing by food preparers during the several hours of observation at the facility. Moreover, he testified, soap and towels were not available in some toilet facilities used by food preparers, and when soap was available there was no indication that it in fact had been used because it was dry and there was no evidence of water in the basins. *Id.,* pp. 3–5, 24–29, 53–58.

The District of Columbia ignores this testimony as to the unsanitary conditions in the kitchen that were immediately under the control of its agent Aramark. Nor does it address the testimony by Powitz and by Plaintiff himself describing unsanitary conditions in connection with food service provided to inmates confined to their cells. Powitz testified that there was risk from the multiple handling of trays delivered to inmates in cells, sometimes by as many as six individuals. As a result "the sanitation or maintaining the integrity of the food" was lost. Powitz Dep. pp. 30–31. He also observed risk in the decisions of the staff to remove their gloves within moments of being issued them. Powitz Dep. pp. 30–31. In addition to his expert's testimony, Plaintiff himself testified that inmate servers dispersing the open food trays had not been given a health screen and often were not wearing hair or beard guards or gloves. Caldwell Dep. pp. 161–63, 196–98. Plaintiff testified that open trays were dragged across dirty floors by inmates and Department of Correction staff, Caldwell Dep. p. 152, and that on at least one occasion mace was sprayed near

open trays spread out on two tables (although inmate tiermen said the trays served ultimately were not the original trays). He testified that on perhaps six occasions he found "some foreign object" in his own tray, primarily hair, sometimes grit or rock, and that a hair had been in his bag lunch the day of his deposition. Caldwell Dep. pp 157–58.[22] Use of gloves, hair guards, and sealed trays appears to be sporadic according to entries in Plaintiff's diary, Plaintiff's Opposition, Exhibit V.

Plaintiff has shown more than what the District of Columbia terms "the lack of aesthetically-pleasing food"[23] to support his Eighth Amendment claim. Plaintiff has produced significant evidence of unsanitary conditions in the Maximum Security Facility kitchen and in the procedures for distributing food trays to inmates such as he who were confined to their cells. Neither Aramark nor the District of Columbia contend that they were unaware of these conditions.

An Eighth Amendment violation may be supported by a serious risk of future harm. *See Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993), in which the Court pointed out that a prisoner can complain about demonstrably unsafe water without waiting to develop dysentery. When asked to "quantify the level of risk to" Plaintiff from the conditions he observed in the kitchen at Maximum, which Aramark controlled, Powitz testified that

> [t]here are only two issues that rise to a point of concern. One I was not able to

**22.** Plaintiff testified that other named inmates had told him that there was roach and rodent infestation in the culinary unit, water dripping from pipes onto food on steam tables, and at least one instance in which an Aramark employee was seen taking food from the garbage and placing it on an inmate tray.

The Aramark employee, Plaintiff heard, was fired. Caldwell Dep. pp. 153, 161.

**23.** Memorandum of Points and Authorities filed by District of Columbia and Caesar, unpaginated, page 8.

determine. That's the HACCP. But the other is the personal hygiene. And the personal hygiene leaves much to be desired, in terms of supervision of the kitchen staff. There *you can expect oral-fecal contamination of food, if personal hygiene is not effected in the proper manner.* And that's universal. That's more than 50 percent of all food-borne illnesses, are directly correlated to personal hygiene.... Personal hygiene is a high level of risk.

Powitz Dep. pp. 22–23 (Emphasis added).

Powitz's testimony differentiates this case from *Scott v. District of Columbia, supra.* *Scott* involved a claim by Lorton inmates that the Eighth Amendment had been violated when they were exposed to second-hand smoke. The opinion by the Court of Appeals focused solely on the propriety of granting injunctive relief and the scope of that relief. In this case, Plaintiff seeks only monetary damages and thus *Scott* is not relevant authority for granting summary judgment to the Defendants in this case.

The significant evidence that the food served to prisoners at Maximum was prepared and served under unsanitary conditions is sufficient to raise a jury question as to whether Plaintiff's Eighth Amendment rights were violated; the extent of violation and the appropriate amount of damages will be up to the jury to determine.

### 2. Adequacy of Nutrition

 Plaintiff also bases his Eighth Amendment claim on his contention that the food supplied was nutritionally inadequate and at times did not comply with the requirements of a vegetarian diet. Aramark contends that the evidence shows that the meals provided to prisoners on a lacto-ovo vegetarian diet are nutritionally balanced and adequate.[24] It relies on the deposition testimony of two expert nutritionists retained by Plaintiff, Jenny Roper and Patricia Bertron, and on a written opinion by its employee-nutritionist Dorothy Zimmer. Plaintiff argues, in opposition, that he weighs less than is desirable for a man of his height and age as a result of the inadequate meals provided by Defendants. Although his evidence shows that he gained weight while at Maximum, his last measured weight, 180 lbs., was at the low end for persons of his height.

The dieticians agree that the sample lacto-ovo-vegetarian menus provided adequate nutrition for a man of Plaintiff's age and height. Bertron Dep. pp. 65–68, 94–95; Roper Dep. pp. 27–28; Zimmer report, Aramark Exhibit 11.[25] Plaintiff objects that the meals he was actually served did not comply with the lacto-ovo-vegetarian meal plans prepared by Aramark headquarters.[26] He testified that on occasion

---

**24.** The District of Columbia does not present any argument whatsoever on this issue.

**25.** Plaintiff testified that he is 6'5" tall. Caldwell Dep. p. 60. Bertron testified that according to Government guidelines, at 180 lbs Plaintiff would fall within the healthy weight for a person 6'4" or 6'5". Bertron Dep. pp. 85–87. According to a 1976 guideline from a *Handbook of Clinical Dietetics*, the desirable weight (neither underweight nor overweight) for a person of his height might be as much 202 or 208 lbs, depending on his height and body frame. Bertron Dep. pp, 69–77, 87. Roper reported that according to a 1989 stan-

dard a male over 50 years of age, 6'4", should weigh at least 187 pounds. Exhibit C, page 13.

Aramark's witness Zimmer noted that an inmate's weight may be affected by the amount of food the inmate eats, his emotional state, his physical activity, and his genetic makeup. She noted most inmates choose to miss approximately 20 percent of the meals. Aramark Motion, Exhibit 11.

**26.** Plaintiff also objects to the fact that some of the meals provided were high in fat and cholesterol. The lacto-ovo vegetarian meals

he was provided regular meals with the meat or fish removed and without any meat substitute to provide protein. At least one time all the food on the tray was contaminated by meat gelatin [27] that had melted so that he could not eat any of the food served. Caldwell Dep. pp. 150–51. Plaintiff's expert witnesses testified that the regular menus with the meat product removed would not provide a nutritionally adequate diet. Bertron Dep. pp. 49–51, 63–64; Roper opinion, Plaintiff's Exhibit C, 2d page. Plaintiff's Exhibit S is his record of 28 meals during 1999 when he was served a regular tray with the only protein being meat.

Even if on occasion Aramark was responsible for delivering to Plaintiff a diet which was inconsistent with his vegetarian regime, this might not constitute a violation of the Eighth Amendment. Rev. Delahunt testified that each member of the Liberal Catholic Church should determine his "own level of vegetarian practice after carefully considering his physiological and hygienic status, so that the health is maintained and enhanced and not imperished [sic—imperilled?]." Plaintiff's Amended Opposition, Delahunt Dep. p. 42. Thus, Defendants suggest, it was Plaintiff's own choice to decline to eat if a non-vegetarian meal was served, a choice not mandated by his religious beliefs. Moreover, when on occasion non-vegetarian meals were served, Plaintiff was able to supplement his meals with tuna fish that he purchased from the canteen. Caldwell Dep. pp. 29–30.

The evidence as to whether the meals provided Plaintiff were sufficiently nutritious is, however, contested. There is a genuine issue of material fact as to whether the meals actually served Plaintiff were so lacking in nutrition on sufficient occasions as to deprive him of adequate food necessary to maintain his health and thus to constitute cruel and unusual punishment. For these reasons Defendants' motions for summary judgment on Count III will be denied.

### D. The Negligence Claim

■■■ The Aramark Defendants argue that Plaintiff cannot establish the elements of a negligence claim under District of Columbia law because he cannot demonstrate an applicable standard of care that has been breached by the Aramark Defendants or that he has suffered any injury as a result of actions of these Defendants. The District of Columbia Defendants state without any discussion or analysis that Plaintiff has failed to allege or prove the elements of a negligence claim.[28]

On the contrary, Plaintiff has shown at a minimum that the conditions of food service were such as to violate District of Columbia law requiring persons involved in food service to wash their hands regularly. Title 23, Subtitle B of the District of Columbia Municipal Regulations provides in pertinent part:

> Any person who works in any capacity, the activities of which include contact with unprotected food for human consumption or the care or use of food contact surfaces in a food operation, shall wash his or her hands thoroughly in an approved hand-washing facility before starting work, and as often as may be necessary to remove soil and contamination.

were considerably lower in fat and cholesterol than the meals served on the regular diet plan.

**27.** A letter from defense counsel to Plaintiff's counsel, Attachment T to Plaintiff's Opposi-

tion, confirms that the gelatin served does contain a beef by-product.

**28.** Once again the District of Columbia Defendants have failed to address a significant legal issue.

23 DCMR § 2600.3. Furthermore, "[n]o person shall resume work after visiting the toilet room without washing his or her hands." 23 DCMR § 2600.4. Neither Aramark nor the District of Columbia argue that these regulations were not applicable to food service at Lorton.[29]

 Aramark contends that expert testimony is needed to assess these issues in the context of a prison. The Court disagrees. An average juror is capable of deciding whether food was prepared and served in a sanitary or an unsafe manner. Whether in a home or in an institution, moldy bread is inedible, hot food must be maintained at a minimum temperature to prevent the growth of harmful bacteria, ceiling water should not drip on food, pots and utensils should be washed. It is elementary that persons engaged in food preparation and service should wash their hands after handling raw foods and after using the toilet. The testimony of Robert Powitz, discussed above, creates an issue of fact as to whether these sanitation standards were violated by practices by the food preparation and service at Maximum. Plaintiff's own testimony, if credited, would support a claim for negligence in the delivery of meals to inmates unable to go to the dining hall.[30] Expert testimony is not necessary when the causal connection between a situation and an injury is clear or relates to common experience. *Williams v. Patterson,* 681 A.2d 1147 (D.C. 1996). The question whether and to what extent Plaintiff was injured or may become ill in the future because of the unsanitary practices is for a jury.

Because there is no evidence that Defendant Caesar was involved in the food prep-

aration or delivery except in connection with authorization of medical or religious diets, summary judgment will be granted for him on Counts III and IV and denied as to all other Defendants.

## IV. Conclusion

Summary judgment, therefore, will be granted for Defendant Caesar on the Third and Fourth Counts of the Complaint. The motions for summary judgment in all other respects will be denied.

An appropriate order accompanies this Memorandum Opinion.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is by the Court this 21st day of May, 2001,

**ORDERED** that the motion of Defendants Aramark Correctional Services, Inc., Raglan, and Proctor for summary judgment [Dkt. # 69–1] is **DENIED**. It is

**FURTHER ORDERED** that the motion of Defendants District of Columbia and Caesar to dismiss the Amended Complaint [Dkt. # 75–1] is **DENIED**. It is

**FURTHER ORDERED** that the motion of Defendants District of Columbia and Caesar for summary judgment [Dkt. # 75–1] is **GRANTED** as to Defendant Caesar on Counts III and IV of the First Amended Complaint and is otherwise **DENIED**. It is

**FURTHER ORDERED** that a status hearing in this case is set for May 31, 2001 at 9:45 a.m.

**29.** The food service contract provides that Aramark must meet all sanitation standards established by the District of Columbia Department of Consumer and Regulatory Affairs, including the regulations quoted above.

**30.** Plaintiff asserts that he would present additional testimony at trial.